[Crim. No. 1448. Third Appellate District.—February 1, 1936.]

THE PEOPLE, Respondent, v. SI RUBENS et al., Appellants.

Frank G. Warren and Lester B. Godward for Appellants.

U. S. Webb, Attorney-General, and Ralph H. Cowing, Deputy Attorney-General, for Respondent.

THOMPSON, J.—The defendants have appealed from judgments of conviction on several separate counts of an indictment for grand theft, conspiracy to commit a crime under section 182 of the Penal Code, and for violation of the Corporate Securities Act in issuing and selling to various named individuals certificates of interests in an oil and gas lease without securing from the corporation commissioner of California a license therefor. These defendants also purport to have appealed from an order denying their motion in arrest of judgment.

It is asserted each of the counts of the indictment fails to specifically allege facts sufficient to constitute a public of-

fense; that the evidence fails to support the verdict and judgment chiefly because the documents upon which the prosecution relies in support of the judgment are mere options for the purchase of an interest in real property and on the contrary that they are not certificates of interest in an oil and gas lease; that the court erred in excluding evidence intended to rebut a showing of fraudulent representations respecting the condition of the oil wells which are involved in the transaction; that the court erred in giving and refusing certain instructions and in pronouncing sentence in less than two days after the rendering of the verdict contrary to the provisions of section 1191 of the Penal Code.

■ The statute does not authorize an appeal from an order denying an arrest of judgment. (Sec. 1237, Pen. Code; *People* v. *McCalla,* 63 Cal. App. 783 [220 Pac. 436] ; *People* v. *Jackson,* 138 Cal. 462 [71 Pac. 566].) Section 1237, *supra,* provides that a defendant may appeal, only, from a final judgment of conviction, from an order denying a motion for new trial and from an order made *after* judgment. It is obvious that an order denying a motion in arrest of judgment is necessarily made before and not after judgment is rendered. The purported appeal from the order denying defendants' motion to arrest the judgment is therefore dismissed.

■ We are of the opinion each count of the indictment states facts sufficient to constitute the offense with which it purports to charge the defendants. (*People* v. *Ratliff,* 131 Cal. App. 763 [22 Pac. (2d) 245] ; *People* v. *Main,* 75 Cal. App. 471 [242 Pac. 1078].) Each count is couched in clear and concise language describing the public offense with which the defendants are charged. Each count conforms to the provisions of sections 950, 951 and 952 of the Penal Code. The chief challenge to the sufficiency of the allegations of the indictment refers to an alleged failure to specify facts constituting the particular charges of issuing and selling certificates of interest in the oil lease contrary to the inhibition of the Corporate Securities Act so as to enable the defendants to plead former conviction of such transactions in any subsequent prosecution therefor. ■ The indictment, as amended, alleges in each count that the defendants, on a specified date "did wilfully, unlawfully and knowingly authorize, direct and aid in the issue and sale of, and did issue,

execute and sell, and cause, and assist in causing to be issued, executed and sold for value to'' individuals who are named therein, ''a security of their own issue, as defined in said Corporate Securities Act, to-wit: A certain certificate of interest in an oil and gas lease'' on specifically described real property in Sacramento County, ''without first having applied for and secured from the Commissioner of Corporations of the State of California a permit authorizing them so to do''. This is a sufficient allegation of facts constituting the public offense prohibited by the provisions of section 18 of that act. (Stats. 1917, p. 673; 2 Deering's Gen. Laws, 1931, p. 1924, Act 3814, and amendments thereto.) There is no merit in the contention that the indictment fails to state facts sufficient to constitute the public offenses against the defendants which are sought to be charged therein.

There appears to be nothing in the cases of *People* v. *Mahony,* 145 Cal. 104 [78 Pac. 354], *People* v. *McKenna,* 81 Cal. 158 [22 Pac. 488], or *People* v. *Lamanuzzi,* 77 Cal. App. 301 [246 Pac. 557], upon which the appellants rely, in conflict with the preceding determination as to the sufficiency of the allegations of the indictment.

█ There is a conflict of evidence regarding many issues of the case. The evidence, however, satisfactorily shows that the defendant, Si Rubens, owned an oil lease on 1283 acres of land in Sacramento County, which land is described in the indictment, authorizing him to prospect for, sink wells and produce oil and gas from the property upon terms which are expressed therein; that he sold the interests in the enterprise under the fictitious name of Capitol Lease Development Company and operated the oil development business in the name of the Great American Petroleum Company, a corporation having 25,000 shares, of which he was president and manager and owned all but two shares thereof; that the other appellants, Appleton and Linder, were agents and salesmen of the enterprise who knowingly participated in the illegal sales of the certificates of interest complained of; the defendants solicited customers and for a consideration sold interests in the oil-producing project; upon payment to the defendants of the sums of $17.50 by the respective purchasers named in the indictment, a document was executed and issued to each by the Capitol Lease Development Company, as seller. This document is termed an ''option to purchase oil and gas

lease assignment". It purports to *give* to the vendees an "option to purchase oil and gas lease assignments of [an undivided] five-sixty-fourths (5/64) of an acre" of the 1283 acre tract of land, but failed to describe the allotted portion thereof. It contains a provision that within thirty days from the "bringing in" of the first well on the entire tract of land, the purchaser shall pay an additional sum of $30, entitling him to a community lease for his proportionate interest in the entire project. A copy of the proposed community lease was set out in full and attached to the so-called option. This option provides for the drilling of five oil wells on each purchaser's property by the Great American Petroleum Company, under specified terms and conditions, which procedure is designated therein as "a part of a proposed drilling program that calls for the drilling of a well to each ten (10) acres on the above described property, until the total of one hundred and twenty-eight (128) wells shall have been completed" on the entire property. The so-called option then stipulates that the Great American Petroleum Company will, upon completion of the contracts to purchase the assigned interests, execute to each of the purchasers a "community lease" for his proportionate interest in the entire project on a participating basis in the profits of the enterprise as follows: 12½ per cent thereof "to land owners"; 15 per cent "to the sub-lessors"; 22½ per cent "to the Great American Petroleum Company", and 50 per cent "divided among the separate leaseholders entering into the community lease agreement, in the same proportion as each leaseholder's holdings bears to the full number of lease parcels contained in the community lease". A bank was then named as trustee to receive and distribute to the shareholders the funds derived from the enterprise in accordance with the provisions of the contract.

Attached to the so-called option above referred to was the detailed form for the proposed community lease to be issued by the Great American Petroleum Company, which, in effect, is a contract making each purchaser a *pro rata* shareholder in the oil-producing enterprise in the entire 1283 acre tract of land. It provides that all interests in the project "shall nevertheless be developed and operated as one lease"; that "the assignee and separate assignors herein are to bear production and marketing costs of entire production in propor-

tion that the interest bears to the entire lease"; that a designated bank shall act as trustee to receive and distribute to the respective shareholders the proceeds of the enterprise in the proportions heretofore specified. The Great American Petroleum Company covenanted to operate the enterprise and sink a maximum number of 128 wells pursuant to the agreement, and to promptly account for all proceeds therefrom.

We are satisfied the transaction above related amounts to sales or offers of sales of *pro rata* participation interests in an oil and gas-producing enterprise to be operated by the lessee, evidenced by written instruments in the nature of certificates of participating interests or securities therefor, in direct violation of the Corporate Securities Act of California. Each unit or share represents a five sixty-fourths undivided portion of an acre and upon completion of the first well and the payment of the total sum of $47.50 the purchaser is entitled to his stipulated *pro rata* proportion of the net proceeds derived from sales of all the oil and gas produced from all the wells on the entire tract of 1283 acres of land.

Section 18 of the Corporate Securities Act provides that:

"Every officer, agent, or employee of any company and every other person, who knowingly authorizes, directs, or aids in the issue or sale of, or issues or executes, or sells, or causes or assists in causing to be issued, executed, or sold, any security, . . . contrary to the provisions of this act, . . . or who, with knowledge that any security has been issued, or executed, in violation of any of the provisions of this act, sells, or offers the same for sale, . . . or who, in any respect, wilfully violates or fails to comply with any of the provisions of this act, . . . or who, with one or more other persons conspires to violate . . . any of the provisions of this act, is guilty of a public offense and shall be punished . . ."

The term "security" is defined in section 2 (a), subdivision 7, of the same act, as follows:

"The word 'security' shall include any stock, bond, note, treasury stock, debenture, evidence of indebtedness, certificate of interest or participation, certificate of interest in a profit-sharing agreement, *certificate of interest in an oil, gas or mining* title or *lease*, collateral trust certificate, any trans-

ferable share, *investment contract, or beneficial interest in title to property, profits or earnings, . . .*"

Under circumstances very similar to those which exist in the present case it was determined in the recent cases of *People* v. *Craven*, 219 Cal. 522 [27 Pac. (2d) 906], and *Domestic & Foreign Petroleum Co., Ltd.*, v. *Long*, 4 Cal. (2d) 547 [51 Pac. (2d) 73], that contracts which were called "grant deeds" assigning undivided interests in oil and gas leases entitling the holders thereof to participate in the proceeds of the petroleum produced by the vendor from the land were in fact "securities" within the meaning of the Corporate Securities Act which are prohibited from being transferred or sold without first procuring a permit therefor from the corporation commissioner. In the last-mentioned case it was contended, as it is in this case, that the challenged instrument was called a deed and was in the nature of a deed containing the significant language that the leasehold interest in land was thereby "granted and conveyed" and on the contrary that it was therefore not a "security" for an interest in an oil enterprise. The court said in that regard:

"It is the contention of defendants that the lessees herein did not issue a security, but granted undivided interests in the leasehold estate, which leasehold is an estate in real property, or in the oil to be produced therefrom; that the instruments of transfer are entitled 'grant deed,' and use the words 'grant' and 'convey,' which are appropriate to a deed rather than to a certificate of interest or a security. The contention that the interests are not securities is fully answered by our decision in *People* v. *Craven*, 219 Cal. 522 [27 Pac. (2d) 906]. . . . The decision fully sustains the constitutionality of the provisions of the Corporate Securities Act which require an individual to obtain a permit to issue securities as applied to an individual oil lessee who assigns oil interests such as those in the Craven case, *and in the case now before us.* . . .

"Instruments such as those in the Craven case and the instant case are not issued to persons who expect to reap a profit from their own services and efforts exerted in the management and operation of oil-bearing property, but to those in the category of investors, who, for a consideration paid, stipulate for a right to share in the profits or proceeds

of a business enterprise or venture to be conducted by others.
. . .

"In decisions in this state and in other jurisdictions where it has been contended that a transaction under attack did not come within the Corporate Securities Act because it constituted only a sale of specific real or personal property or an interest therein, the courts have looked through form to substance and found that in fact the transaction contemplated the conduct of a business enterprise by others than the purchasers, in the profits or proceeds of which the purchasers were to share."

The preceding language of the Supreme Court is peculiarly applicable to the facts of the present case and conclusively answers adversely to them the very contentions made by the defendants on this appeal.

■ Assuming that the assignments of interests or securities which were sold in this case were all actually owned by the defendant, Rubens, and that they were therefore securities of "his own issue", as the indictment alleges, the other defendants, Appleton and Linder, who aided, assisted and conspired to unlawfully sell and transfer these interests contrary to the Corporate Securities Act would also be guilty as principals in the transaction. (Secs. 31 and 971, Pen. Code.) Moreover, the Corporate Securities Act specifically makes an agent or employee guilty as a principal who unlawfully solicits sales or sells securities without a license so to do. Section 2 (a), subdivisions 8 and 9 of the act provide that:

" . . . 'sale' or 'sell' shall also include a contract of sale, . . . an option of sale, a solicitation of a sale, . . . directly or *by an agent.*

"9. The word 'agent' means and includes every person or company employed or appointed by a company or broker or any other person who shall, within this state, either as an employee or otherwise, for a compensation, sell, offer for sale, negotiate for the sale of or take subscriptions for any security."

Upon the authorities of *People* v. *Craven* and *Domestic & Foreign Petroleum Co., Ltd.,* v. *Long,* above cited, it is clear that the so-called options or assignments of interests in the oil enterprise to be conducted by the Great American Petroleum Company, which was managed, controlled and almost exclusively owned by the defendant, Si Rubens, were, in

effect, securities or certificates of interest in the oil enterprise, the issuing and sales of which are prohibited by the Corporate Securities Act until a license to do so has been first procured. These securities were therefore sold and transferred in violation of the act.

It was not error for the court to admit in evidence true copies of the written instrument representing the assignment of interests complained of, for the reason that the defendant, Rubens, admitted that they were exact copies of the original documents. In response to the following question: "I will show you an instrument marked 'Assignment and Agreement, East Coyote Hills,' and ask you if that is a duplicate form used in this development, with the exception of the words 'Coyote Hills'?", he replied: "A. And with the exception of 'Coyote Hills'." Mr. Atherton, one of the defendants' attorneys also stipulated that the copy of the community lease which was attached to the option for assignment was a true copy of the original. It was conclusively proved that the original documents were in the possession of the defendants. Mr. Bailey testified that the original instruments were taken by the defendants and remained in their possession. The language of these instruments was not disputed at the trial. Having shown that the original instruments were not available, but on the contrary that they were in the possession of the defendants, the true copies thereof were competent evidence. (*People* v. *Chapman*, 55 Cal. App. 192 [203 Pac. 126]; *People* v. *Jarvis*, 135 Cal. App. 288, 311 [27 Pac. (2d) 77]; 16 C. J., p. 616, sec. 1219.) In the Chapman case, *supra*, it is said in that regard:

"It is axiomatic that the court cannot compel the defendant in a criminal case to produce any incriminating writing. It is for this reason that, ordinarily, the prosecution may give secondary evidence of the contents of an incriminating document whenever it appears *prima facie* that it is in the possession of the accused."

The court did not err in refusing to give an instruction which was offered by the defendants to the effect that although the purchaser of a lease of land may expect thereby to derive a profit from his investment, the instrument may not be deemed to constitute a security or certificate of interest in an oil enterprise in contemplation of the Corporate Securities Act, the issuing or sale of which is prohibited,

until a license therefor has been first procured. Nor did the court err in refusing to give the following instruction:

"You are instructed that a deed to, a lease of, an assignment of interest in or an option to purchase a lease or an interest in oil land is not in itself a security as defined in the act of the Legislature of the State of California, approved May 18, 1912, Statutes of 1917, page 673, as amended and known as Corporate Securities Act."

It is contended these instructions are proper and should have been given to the jury on the authority of *People* v. *Steele,* 2 Cal. App. (2d) 370 [36 Pac. (2d) 40]; *Callahan* v. *Martin,* 3 Cal. (2d) 110 [43 Pac. (2d) 788, 101 A. L. R. 871]. We think not. These instructions have no application to the facts of the present case. They are misleading and were properly rejected. The distinction between the facts of the Steele case, *supra,* and the present action is very clear and vital. In that case, Steele was the owner of a certain placer mining claim and machinery. The prosecuting witness, Dunn, leased this claim and machinery for a period of two years in consideration of the sum of $250 for the purpose of operating the claim as a mining enterprise solely by his own efforts. He agreed to pay the owner of the claim a large percentage of whatever proceeds he derived from the mining enterprise. The lessor had no part in or obligation to perform any service in connection with the proposed enterprise. The court clearly says in that regard:

"In the case now before us the agreement contemplates no return on the money invested, other than the right to use certain property, and any anticipated profits could come only through the proceeds of operations to be conducted by the complaining witness himself."

Under such circumstances there could be no violation of the Corporate Securities Act by merely leasing the land for the lessee to conduct his own independent enterprise thereon. This distinction is also recognized in the recent case of *Domestic & Foreign Petroleum Co., Ltd.,* v. *Long, supra,* from which we have heretofore quoted. In the present case the challenged instrument does not create an interest by assignment in an oil-producing enterprise to be operated and conducted by the defendants alone. Nor are the facts of the Callahan case applicable to this case. The question of a violation of the Corporate Securities Act was not involved

therein. Since the submission of· this case, the Domestic & Foreign Petroleum Company case, upon which the appellants rely, has been decided by the Supreme Court on hearing from the District Court of Appeal, and regardless of whether it be deemed that such a lease creates an interest in real property or not, it has been definitely determined that the transfer of such a document creating an interest in the proceeds of an oil enterprise to be conducted by the lessor or assignor, is deemed to be in the nature of a security or certificate of oil interest within the meaning of those terms as they are used in the Corporate Securities Act.

 The jury was clearly and properly charged in several instructions regarding the essential elements constituting the terms of "a security" and "a certificate of oil interest" as they are used in the Corporate Securities Act. The court was authorized to determine as a matter of law and to instruct the jury regarding the legal effect of the terms of the challenged "option to purchase oil and gas lease assignment". (*People* v. *McCalla*, 63 Cal. App. 783, 789 [220 Pac. 436].) But the court did not do so. It was very cautious, very clear and very fair in instructing the jury regarding the effect of the instruments which are involved on this appeal. We are satisfied there was no error committed in giving to the jury or refusing instructions.

 Finally it is contended the court erred in pronouncing sentence upon the defendants in less than two days after the rendering of the verdict of conviction, contrary to the provisions of section 1191 of the Penal Code. It is true the verdict of the jury was rendered in this case on June 11, 1935. Judgment was inadvertently pronounced on June 13, 1935. The defendants, with their counsel, were present in court and were asked if they had any reason to suggest why judgment should not then be pronounced against them. No reason for delay was then suggested. Neither the defendants nor their attorneys replied to the inquiry of the court. No objection was made to the pronouncing of sentence at that time. The defendants waived their right to object to the failure to pronounce sentence within the time prescribed by statute. The time for pronouncing sentence in a criminal case is not jurisdictional. No prejudice resulted from the premature sentence. It has been uniformly held that in the absence of a showing of prejudice therefrom the

failure to strictly comply with the provisions of section 1191 of the Penal Code with respect to the time for pronouncing sentence is not reversible error. (*People* v. *Zuvela,* 191 Cal. 223 [215 Pac. 907]; *People* v. *Stroff,* 134 Cal. App. 670 [26 Pac. (2d) 315]; *People* v. *Kloss,* 130 Cal. App. 194 [19 Pac. (2d) 822]; *People* v. *Powell,* 83 Cal. App. 62 [256 Pac. 561]; *People* v. *Haines,* 64 Cal. App. 628 [222 Pac. 183].) The time for pronouncing sentence in a criminal case is merely procedural in its nature. Under the provisions of article VI, section 4½ of the Constitution, a failure to comply strictly with the provisions of section 1191 of the Penal Code in imposing sentence is not reversible error unless it results in a miscarriage of justice.

Upon rehearing our attention is called to the erroneous rejecting of the testimony of six witnesses offered by the defendants to rebut the testimony of the prosecution concerning alleged fraudulent statements made by the defendants regarding the nature of the soil and the prospects of striking oil on the land of the Capitol Lease Development Company called the "Coyote Field", and the "Clay Field", as inducements for the purchasers of interests therein to part with their money which was paid therefor. In rejecting this rebuttal evidence the court erroneously held that the question of fraud was not involved in the case. It said: "I think it's collateral matter, entirely outside the issues of this case, whether there is oil there. There may be millions and billions of gallons, but that has nothing to do with whether or not these people were selling securities without a permit."

Over the objections of the defendants, six witnesses were permitted to testify for the prosecution to alleged false and fraudulent statements made to the purchasers of interests in the oil enterprise to the effect that the soil in question indicated the presence of oil; that they had already struck "oil sand" and gas with a pressure that nearly blew the pipe and drill out of the well; that the formation indicated the producing of at least 600 barrels of oil a day; that the conditions resembled the famous Kettleman Hills oil field, and that the purchasers were urged to buy their shares promptly as the price would certainly advance. At least one of these witnesses testified that he relied on these statements and was induced thereby to purchase his shares. Lloyd Adams

said in that regard: "Anyone knows the Kettleman Hills' formation is an oil-producing formation, and when anyone states they are drilling a well, going through a Kettleman Hills' formation naturally carries great weight."

Mr. Adams, who was called by the prosecution, testified over objection that he was told by the defendants that the property contained cretaceous soil of good oil formation. Mr. DeVinny said that Appleton told him about the gas pressure which they had struck "which was a very good indication of oil". Mr. Burchfiel testified that Sidebotham, the sales manager of the oil enterprise, told him "they were now in the oil sand" and that they had better buy their shares quickly before the price advanced. This witness also testified that Appleton said, "We have oil at Clay. . . . We have a core taken from that oil sand, . . . some oil extracted from that sand . . . (that) would produce approximately . . . six hundred barrels per day." Dorothy Clesen testified that Mr. Rubens told her they were then "in proven oil fields", and that the gas pressure was so great "they couldn't drill any further, that the well would blow in".

To rebut this evidence which was offered for the purpose of showing that, to induce the purchase of shares, the defendants made fraudulent and false statements to the purchasers thereof with relation to the nature of the soil, the presence of gas and oil and the prospects of producing good commercial oil wells, the defendants called Mr. Furber, a graduate geologist of considerable experience, and one other witness, to testify that the soil in question was first-class oil-producing formation; that the prospect of striking oil in commercial quantity was good, and that they had actually produced oil in the well in question. Mr. Grabel was asked in that regard: "Q. Do you know whether or not . . . any oil was ever encountered in the well at Clay?" To the questions propounded to these witnesses for the purpose of rebutting the testimony of the prosecution concerning alleged false and fraudulent representations, the court sustained objections thereto on the theory that the element of fraud was not involved in the charges of illegally selling certificates of shares in the oil enterprise without first procuring a license from the corporation commissioner of California. The court overlooked the competency of the issue of fraud in the charges of grand theft. The defendants then offered to

prove similar facts by four or five other witnesses, to which testimony the court also sustained objections on the same grounds.

The rejecting of this evidence constituted prejudicial error. It was competent to show the actual conditions which existed in the oil field to rebut, if possible, the alleged false and fraudulent statements of the defendants regarding the nature of the soil and the prospects of producing oil in commercial quantity, and to disprove the element of fraudulent representations in securing the money of the purchasers of certificates of interest in the oil enterprise on the charges of grand theft of which they were also convicted.

The learned trial judge evidently overlooked the fact that the defendants were being tried upon several counts of grand theft, as well as other counts of illegal sales of certificates of interests in the oil enterprise without the license of the corporation commissioner. The element of fraud was included in the charges of grand theft, with which the defendants were accused. Section 484 of the Penal Code provides in part:

"Every person who shall . . . knowingly and designedly, *by any false or fraudulent representation or pretense,* defraud any other person of money, labor, or real or personal property, . . . is guilty of theft, . . . "

It is apparent that the preceding evidence adduced by the prosecution must have convinced the jurors that the defendants were guilty of grand theft because they had induced the purchasers of shares to part with their money by falsely representing to them the land in question contained good oil-producing soil; that they had already encountered gas pressure, oil sand, and a quantity of oil which assured the development of oil in commercial quantity. Any evidence which tended to prove that these statements were true or that the defendants were not guilty of false or fraudulent representations in procuring the money from the purchasers of the shares was competent. The exclusion of the defendants' rebuttal evidence on that issue was therefore erroneous.

We are persuaded that the evidence of the prosecution of the foregoing alleged false representations, and the exclusion of all evidence tending to rebut the same not only induced the convictions of the defendants of the counts of grand

theft, but that such conduct also prejudiced the jurors in arriving at their verdicts of guilty of the other counts of unlawfully selling the shares without a license so to do and the counts charging defendants with conspiracy to commit a crime under section 182 of the Penal Code.

After a careful reading of the entire record on rehearing, we are unable to say that, in spite of the errors above referred to, the convictions of the defendants were not a miscarriage of justice. The sale of the certificates of interest in the oil enterprise without the license of the corporation commissioner was a violation of the Corporate Securities Act of California. It appears, however, that Mr. Rubens believed that the transactions involved only an interest in real property, and that the real estate commissioner of California had sole jurisdiction of the issuing of licenses therefor; that Mr. Rubens did submit the proposed sales project to the real estate commissioner who instructed him to go ahead with the sales and that he would be notified before any action was taken if it was deemed to be necessary for him to first procure a license for such sales, but that he was never notified of that requirement. In other words, there is some evidence that the defendants were misled into believing that the transactions in question were under the lawful jurisdiction of the real estate commissioner pursuant to statutes of 1919 (Stats. 1919, p. 1252, and amendments thereof; Act 112, vol. 1, Deering's Gen. Laws of 1931, p. 25) and not subject to the Corporate Securities Act.

The judgments are reversed and the cause remanded for new trial.

Plummer, J., and Pullen, P. J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on February 15, 1936, and an application by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on February 27, 1936, and the following opinion then rendered thereon:

THE COURT.—■■■ In denying the petition for a rehearing in this case after decision by the District Court of Appeal of the Third Appellate District, we disapprove of any

intimation which may be drawn from the language of the last paragraph of the opinion, to the effect that the good faith of defendants with respect to the necessity of securing a permit for the sale of the security is a matter of defense.