[Crim. No. 5122.   Second Dist., Div. Three.   Mar. 24, 1954.]

THE PEOPLE, Appellant, v. ALBERT PLATT, Respondent.

Edmund G. Brown, Attorney General, William E. James, Deputy Attorney General, S. Ernest Roll, District Attorney (Los Angeles), Jere J. Sullivan and Robert Wheeler, Deputy District Attorneys, for Appellant.

Jerry Giesler and Rexford D. Eagan for Respondent.

VALLÉE, J.—Appeal by the People from an order granting a motion of defendant to set aside the information charging him with two counts of grand theft and four counts of forgery, on the ground he had been committed without reasonable or probable cause. (Pen. Code, § 995.)

In the information, defendant was accused of feloniously taking $2,500 and $5,000 in money from Michael Epstein and Robert Saltzman; and of forging four merchandise purchase orders, each in the sum of $69.22, publishing and passing them knowing they were false, with intent to defraud each of the four purported purchasers, Michael Epstein, and Robert Saltzman.

Defendant owned a franchise from a manufacturer, covering several California counties, for the sale and distribution of Stroll-O-Chairs, a baby item combination. He also operated the Baby Research Institute through which the combinations were sold. Through an advertisement in a Los Angeles newspaper in which defendant offered to sell exclusive distributorships, he was contacted by Michael Epstein. Epstein was a merchant and manufacturer of infant goods and had a baby items store. About September 11, he went to the Institute; defendant demonstrated the product and explained the modus operandi of the business: how many salesmen would be needed, the number of potential buyers based on population and number of births a day and prenatal cases, and possible profits. Afterwards, Epstein discussed the matter with his neighbor, Robert Saltzman, who in turn contacted defendant a few days later.

After several conversations between defendant and Epstein and Saltzman, it was agreed that the latter two would buy the entire franchise for $7,500. Epstein and Saltzman testi-

fied that defendant had at different times told them he had between 150 and 175 orders for combinations which he would turn over to them, and that they were walking into an established business. By oral agreement, Epstein and Saltzman were to receive 150 or more bona fide orders; defendant was to stay with them for 30 days, train them, show them how to organize salesmen, and help them obtain a franchise direct from the manufacturer. Saltzman gave defendant a check for $200 as a deposit.

On October 1, 1952, the agreement was reduced to writing by attorneys for Epstein and Saltzman and signed by the parties. Defendant warranted, in the agreement, that prior to its execution "he has taken orders for not less than *100* Combinations, delivery of which have not as yet been made." The figure "100" was written in ink in the typewritten agreement. Defendant agreed to assign such orders to Epstein and Saltzman and to deliver to a trustee all moneys in excess of $5.00 per order which he had received from purchasers on account of the orders, such moneys to be held and distributed in accordance with certain instructions. Epstein and Saltzman agreed to pay defendant $7,500: payable $2,500 on the execution of the agreement, receipt of which was acknowledged; $5,000 not later than November 1, 1952, on condition that the franchise had been delivered by that date. They also agreed to pay the dollar value of the inventory on hand as of October 1, 1952. Saltzman testified to what transpired at the time the figure "100" was inserted in the blank space: that on October 1st, he had counted 147 purchase orders which had been lying in a desk drawer at the Institute; however, defendant was supposed to "turn in" 150 orders to them; defendant said, "What must I do now while I'm in here? Should I go out and sell three or four to make the 150? Then I suggested . . . 'I have counted 147 orders. . . . I am perfectly satisfied to have a figure put in no less than 100. On the rest, I'm sure that there is 147.' "

Defendant remained with the business for nearly one month. On October 1, Saltzman began to take an active part in the business, and during October he was in the store every day and worked closely with defendant. During the first part of that month Epstein did not give much time to the business.

Prior to October 1, defendant employed approximately 23 salesmen. In October, defendant interviewed from 150 to 200 prospective salesmen, during which interviews defendant wrote out sample or demonstration orders in their entirety, including

the names of purchasers and salesmen. These orders were not destroyed. "A lot" of additional salesmen were employed. Defendant did not go out into the field and solicit purchasers. Epstein and Saltzman continued to subscribe to a service that gave them a weekly report of the names of new and of expectant mothers.

During October, about 75 purchase orders were received and were placed in the desk drawer. Epstein testified, "Some [of the orders] that were sold I may have thrown away." Defendant entered some of the orders on a yellow work sheet, but it was not an accurate tab of the orders. Saltzman testified that he did not keep any records of any kind of the business during October nor at any time thereafter. All of the orders, both prior to and after October 1, were kept in a desk drawer and were neither filed nor segregated. The moneys received during October were deposited in the account of the trustee in accordance with the terms of the agreement. During the month, about five deliveries of chairs were made to customers.

Epstein and Saltzman obtained the franchise and inventory, and defendant received the money: $200 deposit on October 1, $2,300 on October 3, and $7,500.68 on October 28. The latter sum included $2,500.68 for the inventory.

On October 28 or 29, defendant returned to New York because of the illness of his wife, a fact known to Epstein and Saltzman. He gave them his New York telephone number. The sample or demonstration orders, together with all other records of the business, both prior and subsequent to October 1st, were left with Epstein and Saltzman. At that time, Epstein for the first time counted the purchase orders and found either 150 or 158 orders.

In the middle of December, 1952, after calling "four or five" of the purported purchasers in order to deliver the combinations, Epstein, with Saltzman listening on an extension, telephoned defendant in New York and told him that the orders that were left were forgeries. Epstein testified that defendant threatened he would see they did not receive any merchandise from the factory if they tried to get him back to California. As a result of the conversation, Saltzman went to the Stroll-O-Chair factory in New York and took with him "quite a few" of the 147 orders that he had counted on October 1st. He testified that "by mistake" he left "between 30 and 40 orders" on the desk in the office of the company. No deliveries had been made to any of the purported purchasers whose names appeared on the orders, but Epstein had called four

or five of them. Saltzman then went to Buffalo, New York, where he saw defendant and told him what had occurred: the people whom they called knew nothing about the orders— never placed any orders; and if defendant did not give the money back, he would go to the district attorney. Defendant replied that the orders were given to him by the salesmen. Saltzman did not show defendant any of the orders that he had taken with him to the factory.

Originally defendant was charged in eight counts with forging merchandise purchase orders. At the preliminary hearing, the People introduced in evidence 97 purchase orders.[1] Saltzman identified them and stated that of these 74 were a part of the 147 he had counted on October 1. Three

[1]Due to the fact that there seems to be a variance as to the number of purchase orders introduced in evidence and the testimony relative thereto, the following table is set forth:

| Exhibits | Number of Orders | Salesman* | Orders Dated Prior to Oct. 2 1952 | Orders Dated After Oct. 2 1952 | Orders Not Signed By Defendant | Orders Signed By Defendant |
|---|---|---|---|---|---|---|
| A | 1 | Miller | | 1 | 1 | |
| B | 1 | Fisher | 1 | | 1 | |
| C | 1 | Miller | | 1 | 1 | |
| D | 1 | Fisher | | 1 | 1 | |
| E[1] | 1 | *Eden* | 1 | | | 1 |
| F[2] | 1 | *Eden* | 1 | | | 1 |
| U[3] | 19 | *Eden* | 19 | | | 19 |
| V | 25 | *Ragel* | 16[5] | 9 | 25 | |
| W | 24 | *Bennet* | 24 | | 24 | |
| X | 22 | Fisher | 11 | 11 | 22 | |
| Y[4] | 1 | *Eden* | 1 | | | 1 |
| | 97 | | 74 | 23 | 75 | 22 |

*Italicized—Salesmen who testified.

[1]Count VI

[2]Count V

[3]Count III—Order No. 1771

[4]Count IV

[5]State claims that 19 were included within the 147 counted on October 1st; however 11 of them were dated either on October 1st, or later.

Order Nos:

1817 — October 1, 1952
1818 — October 1, 1952
1819 — October 2, 1952
1820 — October 3, 1952
1821 — October 6, 1952
1822 — October 7, 1952

Order Nos:

1823 — October 7, 1952
1876 — October 15, 1953
1877 — October 17, 1952
1878 — October 18, 1952
1879 — October 20, 1952

The two orders dated October 1, 1952, have been included in the subtotal (16) as orders dated prior to October 2d, and as part of the 147 orders.

salesmen testified. Their testimony related to 71 of the orders in evidence that were purportedly solicited and signed by them. Each testified he had not procured nor signed the orders. Only one of them actually had ever sold any combinations. One of the salesmen, Mr. Eden, testified he never prints his name when he signs it; however, on the orders that were purportedly secured by him, his name is printed.[2]

---

[2]One of the orders purporting to be Eden's reads:

"BABY RESEARCH INSTITUTE
    Exclusive Introductory Agents For
          EVERY-READY                    NO. 1762
          STROLL-O-CHAIR
THE FIVE PURPOSE BABY UNIT
    "It Grows With The Baby"
                SOUTHERN CALIFORNIA OFFICE
5287 W. Pico Bvd.        WE. 3-8429      Los Angeles 19, Calif.
Shipping date............ .. 1-30-53........................
Name .......... .   .   Glen Owens   .     ...............
                (Avoid Errors—Please Print Plainly)
Address ............. 1409 N. Benton Wy.    ....... Apt......
City    ........ .... L. A. 26 ......... State .... Cal......

| | | |
|---|---|---|
| 1  STROLL-O-CHAIR COMPLETE AT INTRODUCTORY PRICE      GREY | | 64.95 |
| | S. Tax | 2.27 |
| DELIVERY AND SERVICE CHARGE | | 2.00 |
| STROLL-O-CHAIR ITEMS ARE NOT SOLD IN STORES | TOTAL SALE | 69.22 |
| A HI-CHAIR A TABLE & CHAIR SET A CAR SEAT A YOUTH CHAIR | DEPOSIT PD | 20.— |
| A STROLLER ALL FOR THE PRICE OF ONE | BAL C.O.D. | 49.22 |

Ask for and keep a copy of this order. No one has authority to change this printed order in any way. This order is not subject to cancellation by you, nor will deposit be refunded, credited, or transferred. We will not be responsible for delays due to strikes, accidents, fires, war, Government priorities or causes beyond our control.

DATE OF ORDER      9-15-52

CUSTOMER'S SIGNATURE      MRS. GLEN OWENS

CUSTOMER'S PHONE

              "WE ALWAYS TRY FOR ADVANCEMENT:
          All advance engineering changes incorporated from
date of order to delivery date will be included at no additional cost
to customer.

              INDEPENDENT DISTRIBUTOR
              Glenn Eden"

The testimony of the three salesmen was also to the effect that of the 74 orders that Saltzman testified were included within the 147 he had counted on October 1st, they had not solicited 62 of them. Nine of these purported orders were dated on or after October 2, 1952.

Eight of the purported purchasers (women) testified they had neither authorized the purported purchases nor had signed the orders. On the date the apparent orders were taken, each of them lived at the address as shown on her respective purported order. Six of the women stated that they each had a child who was born within a period 30 days prior to the date shown on their respective purported orders as the date on which the orders were taken.[3] The testimony brought out the fact that seven children of the purported customers were born within the first four days of September, 1952.

An expert witness identified the printing and writing on Exhibits E, F, U, and Y, a total of 22 orders, as that of defendant; the handwriting on the other exhibits was not that of defendant. Subsequently, the four counts evidenced by Exhibits A, B, C, and D were dismissed. The other four counts for forgery were retained and were incorporated in the information as counts III, IV, V, and VI.

The basis for the charges of grand theft lies in the alleged failure of defendant to turn over to Epstein and Saltzman on October 1, 1952, 100 bona fide orders. It is contended that defendant warranted that he had 100 bona fide orders; that since 62 of the orders were not solicited nor written by the salesmen whose names appear on them, and inasmuch as Saltzman had counted 147 orders on October 1st, there could not have been more than 85 bona fide orders on that date.

The evidence necessary to justify an order holding a defendant to answer to the superior court is not subject to

| [3]Exh. | Order No. | Purported Purchaser | Purported Order Date (1952) | Date of Birth of Youngest Child (1952) |
|---|---|---|---|---|
| A | 1829 | Mrs. Frank Merino | Oct. 6 | Sept. 2 |
| B | 1861 | Mrs. P. Gazzetta | Sept. 23 | Sept. 3 |
| C | 1833 | Mrs. William Aull | Oct. 17 | No child |
| D | 1901 | Mrs. Lewis | Oct. 20 | Sept. 3 |
| E | 1770 | Mrs. Ann [Louise] Levyn | Sept. 23 | Sept. 4 |
| F | 1772 | Mrs. Jane [Diane] Cooper | Sept. 22 | Sept. 1 |
| U | 1771 | Mrs. Mary [Helen] Grieve | Sept. 22 | Sept. 1 |
| Y | 1762 | Mrs. Glen Owens | Sept. 15 | Sept. 4 |

the same test as that before a trial jury in a criminal action, and reasonable or probable cause may be found for holding to answer although the evidence does not establish the defendant's guilt beyond a reasonable doubt. All that is required is a reasonable probability of the defendant's guilt. (*Davis* v. *Superior Court*, 78 Cal.App.2d 25, 27 [177 P.2d 314].) ■ "Reasonable or probable cause," required to uphold the commitment of a defendant (Pen. Code, § 995), exists if there is sufficient proof to make it reasonable to believe that the defendant is guilty of the offense charged. (*People* v. *George*, 95 Cal.App.2d 425, 429 [213 P.2d 33] ; *People* v. *Thomas*, 90 Cal.App.2d 491, 494 [203 P.2d 567].)

■ On a motion to set aside an information, the question of the guilt or innocence of the defendant is not before the court, nor does the issue concern the quantum of evidence necessary to sustain a judgment of conviction. The court is only to determine whether the magistrate, acting as a man of ordinary caution or prudence, could conscientiously entertain a reasonable suspicion that a public offense had been committed in which the defendant had participated. (*Weber* v. *Superior Court*, 35 Cal.2d 68, 69 [216 P.2d 871].) ■ A court may not substitute its judgment as to the weight of the evidence for that of the magistrate. ■ If there is some evidence to support the information, the courts will not inquire into its sufficiency. ■ Under section 995 of the Penal Code, the information will be set aside only where there is no evidence that a crime has been committed or there is no evidence to connect the defendant with a crime shown to have been committed. (*Lorenson* v. *Superior Court*, 35 Cal.2d 49, 55-57 [216 P.2d 859].)

The crime of grand theft is committed when a person knowingly and designedly, by any false or fraudulent representation or pretense, defrauds any other person of property of a value exceeding $200. (Pen. Code, §§ 484, 487.) ■ An information charging grand theft includes the offense of obtaining property by false pretenses. (*People* v. *Myers*, 206 Cal. 480, 483-484 [275 P. 219] ; *People* v. *Payton*, 36 Cal.App.2d 41, 49 [96 P.2d 991].)

■ Although the crime of obtaining property by false pretenses has been included under the designation of theft, the elements of that crime have not been changed. (*People* v. *Selk*, 46 Cal.App.2d 140, 147 [115 P.2d 607].) ■ To establish the commission of the crime of grand theft "sounding in false pretenses," as the charge is made here, these factors

must be proved: (1) the making of false representations of past events or existing facts as distinguished from a mere expression of opinion; (2) that the representations were known to be false and were made with intent to defraud the owner of his property; and (3) that the owner was actually defrauded in that he parted with his property in reliance on the false representations. (*People* v. *Jones*, 36 Cal.2d 373, 377 [224 P.2d 353].)

A representation as to the quantity of a thing offered for sale may constitute a false pretense where it involves a statement of fact known to be false. (35 C.J.S. 651, § 14.) Representations as to the volume of a business are statements of present or past facts. (*People* v. *Foster*, 117 Cal.App. 252, 253 [3 P.2d 586]; *People* v. *Walker*, 76 Cal. App. 192, 203 [244 P. 94]; *People* v. *Raines*, 66 Cal.App.2d 960 [153 P.2d 424]; *People* v. *Wilson*, 130 Cal.App. 760 [20 P.2d 748].) If statements relative to the volume of business are made by a person knowing them to be untrue, with intent to defraud the one to whom they are made, and such person relies on such statements and is induced thereby to part with something of value, the offense of theft, obtaining property by false pretenses, is committed. (*People* v. *Foster*, *supra*.) The signing of a person's name without authority, at least where the instrument has been uttered, is sufficient to imply an intent to defraud. (*People* v. *Horowitz*, 70 Cal.App.2d 675, 687 [161 P.2d 833]; *People* v. *Baender*, 68 Cal.App. 49, 59 [228 P. 536].)

As a result of a newspaper advertisement, Epstein and Saltzman became interested in buying from defendant his franchise to sell Stroll-O-Chairs at an agreed price of $7,500. At different times, defendant orally represented to Epstein and Saltzman that he had and would assign to them between 150 and 175 orders for the purchase of the combinations for future delivery. In the written agreement, he warranted that there were 100 such orders. On October 1, defendant turned over to Saltzman all the purchase orders he had; Saltzman counted 147 orders. Ninety-seven purported orders were introduced in evidence, of which 74 were among the 147 which Saltzman counted on October 1. Three of the salesmen testified that of the 74 orders, they did not solicit nor sign 62 which were purportedly procured by them. Only one of them had sold a chair. Five of the purported customers, of orders that were dated prior to October 1, testified that they had neither authorized the purported purchases

nor signed their names to the orders. The effect of the testimony of the expert was that the printing and writing on 22 of the orders which were turned over to Saltzman on October 1 were that of defendant. Epstein testified that in paying the money to defendant he relied on the statements defendant orally made to him during the period the sale was being negotiated, and on the warranty included in the written agreement concerning the number of orders defendant had for future delivery of the combinations.

Although there are many missing links—orders—in the chain from the time that Saltzman counted 147 orders on October 1 to October 29, when Epstein counted 158, during which interval approximately 75 sales were made, and to the date of the preliminary hearing when only 97 orders were introduced in evidence, we may not weigh the evidence. There was "reasonable and probable cause"—"a strong suspicion"—to believe that defendant's representations were of existing facts; that they were false; that he knew they were false; that they were made with intent to defraud; and that Epstein and Saltzman parted with money in reliance on the false representations.

Defendant is also charged with four counts of forgery. The information alleges that defendant with intent to cheat and defraud the four named purchasers, Epstein, and Saltzman, forged four merchandise orders for the payment of money, each in the sum of $69.22, and uttered, published, and passed them, knowing they were forged.

Forgery is defined in section 470 of the Penal Code. The pertinent part of the section reads: "Every person who, with intent to defraud, signs the name of another person, or of a fictitious person, knowing that he has no authority so to do, to . . . receipt for money . . . or the delivery of goods or chattels of any kind, . . . or other contract for money or other property; or counterfeits or forges the seal or handwriting of another; or . . . passes, or attempts to pass, as true and genuine, any of the above-named false, altered, forged, or counterfeited matters, . . . knowing the same to be false, altered, forged, or counterfeited, with intent to prejudice, damage, or defraud any person; . . . is guilty of forgery." (See *People* v. *McKenna,* 11 Cal.2d 327, 332 [79 P.2d 1065] ; *People* v. *Horowitz,* 70 Cal.App.2d 675, 687 [161 P.2d 833] ; *People* v. *Wilson,* 139 Cal.App. 139, 142 [33 P.2d 476].)

The forging or uttering of an order for the delivery

of goods is a felony. (*People* v. *Way,* 10 Cal. 336; 12 Cal. Jur. 650, § 4.) ▮ The crime of forgery is complete when one "either makes or passes a false instrument with intent to defraud." (*People* v. *Davidian,* 20 Cal.App.2d 720, 724 [67 P.2d 1085].) ▮ The fact of forgery may imply an intention to defraud. (*People* v. *Baender,* 68 Cal.App. 49, 59 [228 P. 536]; *People* v. *Horowitz,* 70 Cal.App.2d 675, 687 [161 P.2d 833].)

▮ The same salesman's name appears on the four forgery count orders. The salesman, Mr. Eden, testified he neither solicited nor signed the purported orders; he never prints his name when he signs it—the name on the orders was printed; and he did not turn in the orders to defendant or to the Institute. The four purported customers testified they had not been contacted about the combinations, they did not authorize the purchases, they did not sign the orders, nor had they given anyone permission to sign their names to the respective purported orders. On three of the order blanks, the first names of the purported purchasers were incorrect. The expert testified that the printing and writing, including the salesman's and purchasers' names, on the four forgery count orders, were defendant's. The four forgery count orders were part of the 147 which were turned over to and counted by Saltzman on October 1st.

From the summarized evidence, there was "reasonable or probable cause"—"a strong suspicion"—to believe that defendant forged the four purchase orders, and presented them as bona fide orders to Epstein and Saltzman with the intent to defraud them.

The evidence is weak, unsatisfactory, and permeated with conclusions of Epstein and Saltzman. It fully merits the comment of the committing magistrate that he had a "strong doubt" that there would ever be a conviction, and the statement of the trial judge that "there is but remote possibility of getting a conviction in this case. It looks to me like it is an effort to use the District Attorney's Office to effect a settlement of a bad business deal that did not pan out the way they wanted it to, but I don't think there is any criminal action." But these are not the tests. Since there is some evidence to support the information, the order setting it aside must be reversed.

Order reversed.

Shinn, P. J., and Wood (Parker), J., concurred.