[Crim. No. 5048.   Second Dist., Div. Two.   Apr. 29, 1954.]

THE PEOPLE, Appellant, v. LOUIS A. SEARS et al., Respondents.

Edmund G. Brown, Attorney General, William E. James, Deputy Attorney General, S. Ernest Roll, District Attorney (Los Angeles), Jere J. Sullivan and Robert Wheeler, Deputy District Attorneys, for Appellant.

Gendel & Raskoff and Bernard Shapiro for Respondents.

MOORE, P. J.—Respondents were accused of having violated the Corporate Securities Law as incorporated in sections 25009 and 26104 of the Corporations Code. The information contains 19 counts. The first count charges them with a criminal conspiracy under which 20 overt acts are declared. Each of counts II to XIII, inclusive except XII, charges respondents jointly with crimes of ''Violation of Corporate Securities Law'' in that respondents in Los Angeles County sold and issued to designated persons for specified sums of money, shares of stock in the Sierra Nevada Oil Company, a corporation organized under the laws of the State of Nevada for profit, without first having applied for and secured from the Commissioner of Corporations of California a permit so to do. By count XII and by each of counts XIV to XIX, respondent Sears is alleged to have committed the crime of grand theft in that, in Los Angeles County, California, on a date specified ''said Louis A. Sears did . . . feloniously take'' a designated sum of money from a party named. After respondents had been arraigned, they filed a motion under section 995 of the Penal Code to set aside the information on the ground that respondents had been committed without reasonable or probable cause. After a hearing on the motion, the trial court granted the demands of respondents and their bonds were exonerated. The matter is here on the appeal of the People.

The question for decision on a motion to dismiss an information under Penal Code, section 995, is not whether the accused is guilty of the crime charged, but only whether the evidence received by the committing magistrate was suffi-

cient to establish a reasonable cause to warrant the filing of the information. This means that if the proof heard at the examining trial would lead a man of ordinary caution or prudence to believe, and sincerely entertain a strong suspicion of the guilt of the defendant, even though there be some doubt, and that there is reasonable cause for committing him, the information must be filed. (*People* v. *Platt*, 2d Crim. No. 5122, filed March 24, 1954, *ante*, p. 123 [268 P.2d 529]; *Lorenson* v. *Superior Court*, 35 Cal.2d 49, 56 [216 P.2d 859]; *People* v. *George*, 95 Cal.App.2d 425, 429 [213 P.2d 33].) In the light of the foregoing we turn to the record of the committing magistrate for a view of the proof made.

## THE EVIDENCE

In proof of each overt act alleged under count I and of the remaining 18 counts of the indictment, it was proved by Deputy Corporation Commissioner Harshbarger and exhibits from the files of the office of the Commissioner of Corporations that after the department had refused to grant an "open" permit to Western Research Laboratories, Inc., on the application of respondent Sears filed November 25, 1949, and the abandonment of the application on April 26, 1950, both respondents turned their attention to the Sierra Nevada Oil Company of Nevada, herein designated "oil company" or "the company." Its articles of incorporation were filed in Nevada on February 15, 1950, at the request of Louis A. Sears. The latter and his wife were two of the original directors. Respondent Sears, whose home was at Altadena, California, was president on September 11, 1952, Victor C. Rose of Bellflower was vice-president, and Rex H. Kaylor of Long Beach, secretary. No mention of the oil company was made by anyone to Mr. Harshbarger prior to the abandonment of the application of Western Research Laboratories. But on March 23, 1951, the Corporation Commissioner of California issued a "Desist and Refrain Order" and forwarded a copy thereof to the oil company at Las Vegas, Nevada, and to the respondents. It forbade them and the oil company "to sell or offer for sale, negotiate for the sale of or deal in any of the shares or other securities of Sierra Nevada Oil Company, a Nevada Corporation, in the State of California, for the reason that the Sierra Nevada Oil Company . . . has no permit" etc. Forms of application for stock in the oil company had been printed and given by Sears to prospective buyers of shares. The witness Bremner saw them in Sears' home in Altadena between April

and June, 1950. At the foot of such form letter was the note: "Please note—the check is payable to Sierra Nevada Oil Co., and is being sent air-mail special. Please return stock certificates registered mail."

Despite the "desist order" neither the oil company nor either respondent ever obtained or applied for a permit to sell the company shares in California.

Also, respondents pursued their objective of selling the shares of the oil company. The witness Dr. Kaylor of Long Beach was invited to attend a meeting at Sears' home in 1950. He there met respondents for the first time. Subsequently on October 14, 1950, Dr. Kaylor forwarded from Long Beach a cashier's check in the sum of $800 to the oil company at Las Vegas, Nevada. In doing so, he used the form letter, Exhibit H, supplied by Sears at his home. He received from the company its certificate 399-a for 800 shares signed by Louis A. Sears, president. It was made to Dr. Kaylor and his wife, and came by mail to his office. On the occasion of the doctor's visit to Sears' home, he met about 50 people, including the witnesses Van Laar and Jacobs. Respondents both made use of maps, talked about money and an oil company and its lands near Worland, Wyoming. On November 4, 1950, Dr. Kaylor forwarded a cashier's check for $300 with the application form letter, to the oil company at Las Vegas, Nevada, and received through the mail a certificate for 300 shares of its stock. Again, on November 20 he forwarded a cashier's check for $500 to the oil company accompanied by an application for stock on the H form letter supplied to him by Sears. He received by mail the company's certificate for 500 shares. On a second visit to the Sears home he found respondents and the same group who had attended his first meeting; the conversations were about oil. But Dr. Kaylor did not confine his investments to purchases of stock. In April, 1951, after a meeting at Vogel's home and telephone conversation with Sears in Worland, he purchased cashier's checks for $9,000 and mailed them to Sears at Worland. Two months later he received at his home in Long Beach Sears' note for $9,000. He never received money or stock for the $9,000.

After meeting both respondents in Las Vegas, Mr. Rex Kaylor met with Kiers at the home of Mr. Vogel at Bellflower. He told Sears by telephone he would loan the oil company $10,000 and Sears said he would sign the note and promised

"that at some future date when and if it became legal that we should receive stock dollar for dollar." Sears told the witness that the latter could not get stock immediately; it was not legal then to give stock. On the next day, April 16, Mr. Kaylor sent by mail to Sears at Worland a cashier's check for $10,000. It bears stamp of Security First National Bank in Altadena, April 23, 1951. While visiting Sears at Worland in May, 1951, Mr. Kaylor agreed to loan a second $10,000 and on his return to Long Beach on June 2 he purchased a cashier's check for that amount payable to Louis A. Sears and mailed it to the payee at Worland. Sears promised Mr. Kaylor at Worland that on his return to Altadena, he would give Kaylor a note for the money. When he arrived home in late June he forwarded his promissory note to Kaylor, dated April 16, 1951, for $20,000. Immediately thereafter Kaylor was appointed treasurer of the company. On Sears' visit to the Kaylor home in June, he made another loan of $4,250 and received Sears' promissory note for that sum. He never received either stock or cash in payment of the notes. While the loans were to Sears, he told Kaylor it was to be used for the company.

The witness Van Laar from his home at Downey, California, forwarded by mail six separate cashier's checks or money orders to the oil company at Las Vegas and at his home received by mail six separate certificates for shares of the company's stock, made to Van Laar or to members of his family aggregating 1,450 shares.

By use of the mail and by applications on the H-form letter, the witness Vogel from his home in Los Angeles County forwarded to the company at Las Vegas or Worland, seven applications for its shares and made two loans of $1,000 and $1,350. Also, by mail he received certificates for the total of 2,050 shares of its stock and Sears' note for $2,350.

The witness Jacobs lived at South Gate, California. Early in 1950 Kiers told him of the oil company. He visited the drill site in Cajon Canyon. He purchased shares in June, July, August and September, a total of 2,100. All was accomplished by sending cashier's checks to the office of the company at Las Vegas and receiving the shares by mail at South Gate. He attended eight meetings at Sears' home and a stockholders' meeting in Las Vegas. On February 17, 1951, he forwarded by mail from Lynwood, California, to the company at Las Vegas, a money order for $500 for its shares and received a certificate for 500 shares. When he attended a

meeting at Sears' home about March 15, 1951, both respondents were present. At the meeting of April 1, 1951, Sears told him that the corporate funds were tied up; that he needed money to keep the field at Worland in operation; that he would execute his note for moneys loaned and give the money to the corporation. April 16, 1951, he mailed his check for $1,000 to Sears at Las Vegas and in return received Sears' promissory note for that sum properly signed and dated. Also, Jacobs forwarded from his home at Bellflower to Sears at Worland two checks for $3,000 and $1,000. He received a promissory note of Sears for each amount, but neither was ever paid with money or stock.

The witness Bremner purchased a total of 1,050 shares in the oil company at $1.00 per share and received them by mail at his office in Alhambra, California. After his conversation with Sears, he forwarded by mail from San Gabriel and Alhambra to the company at Las Vegas, cashier's checks in payment for his shares. Prior to his investments in the stock, Sears and Kiers assured Bremner there was no promotional stock, but Kiers admitted he drew 10 per cent commission in stock on his own sales and received a remuneration of $50 per week. Bremner was honored by membership on an "advisory committee" whose primary activity was to sell the company's stock.

Kiers met the witness Christo in 1950 when the latter called at Kiers' laundromat with his "family wash." Kiers told him he looked like a right smart boy. He took Christo to Cajon Pass in San Bernardino County to see the company's well and there introduced him to Sears as the president. On his return home, after Kiers' promise that the "shares would be share and share alike," Christo and his wife purchased 500 shares. Kiers prepared the application for their signatures, Christo purchased a cashier's check for $500 payable to the oil company and gave it to Sears. In August, Christo received from George E. Marshall at Las Vegas two certificates of his shares in the company. Christo drove or was conveyed by others to Cajon Pass on subsequent occasions and always met Sears there. Christo attended the meeting at Sears' home March 10, 1951, for a mass meeting of about 75 investors.

The witness Bouma testified that he resides at Norwalk and is a dealer in dairy cattle; that about August 11, 1950, Kiers called at the witness' home. He was introduced by a Mr. Kraan as one selling stock. Kiers told him about the well in

Cajon Pass; that they needed money to finish the well and invited Bouma to visit the well site. They drove to the well with Mr. Scoff. Sears arrived in the afternoon and was introduced by Kiers. On their way home, Kiers asked him to invest $1,000 in the company. He purchased a cashier's check August 21, 1950, for $250 payable to Albert Kiers. Subsequently at Norwalk he received a certificate for 500 shares from Las Vegas. Later he attended a meeting at Sears' home.

The witness Vogel operates a meat market at Bellflower. In May, 1950, at Kiers' laundromat, Kiers told Vogel about the "oil venture" in Cajon Canyon; said Sears and Rose were officers. Rose came in and Kiers asked Vogel to visit the well. He did so at the end of May. Sears was there. About June 5 he sent his check for $750 to the company at Las Vegas. He was told by Victor Rose it could not be bought except by sending to Las Vegas for it. In October, 1950, he made a purchase of 200 shares; August 29, 1950, he purchased 250 shares; November 15 he purchased 50 shares; January 2, 1951, he purchased 500 shares; a week later he purchased 250 shares. In each instance he sent his money by check to Las Vegas and promptly received certificates for shares at $1.00 each. He visited Sears' home about April 4, 1951, met Kiers and heard Sears tell the parties present that the company was short of funds and no more stock was to be issued and to continue operations, he, Sears, could put in his own money and those present could "make a personal loan to him, which in turn would be put into the corporation for future developments . . . he would give us his personal note . . . Mr. and Mrs. Sears would both sign it . . . but if and when stock could be gotten, we could get stock in place of the money loaned." Vogel then told Sears he would loan Sears $1,000, and on his return home, he wrote a check on his personal bank account and, at Bellflower, mailed it to Sears at Worland, Wyoming. One week later Vogel wrote still another check, payable to Louis A. Sears for $1,350 and mailed it to the payee at Worland. It was deposited by Sears at his bank in Altadena on April 23, 1951. About the time Vogel forwarded his check to Worland, a meeting of the stockholders was assembled at his home. Kiers was present and made a telephone call to Sears at Worland. Vogel and other stockholders conversed with Sears over Vogel's telephone.

Harm Bensema was a witness for the People. His home was in Bellflower and he was manager of the United Dairymen's Association in Artesia. He first met Kiers in 1949 and

in August, 1950, in Artesia, Kiers engaged him in a discussion of an oil well venture; told him the stock could not be sold; they had no license, but that Bensema "could send for it"; that they were drilling a well in Cajon Pass. Bensema took his wife, Kiers and Mr. and Mrs. Christo to the well site in Cajon Pass where he met Sears. The latter told him the prospects for oil were good. After returning to his home, he wrote a check payable to A. Kiers for $500 for which he received certificates of stock for 500 shares. Bensema testified that on April 1, 1951, at Sears' home in Altadena in the presence of Kiers, Rex and Lawrence Kaylor, Jacobs, Vogel and others, Sears said no more stock could be issued; drilling would have to stop "if he did not have money to go on . . . I gave him $1000"; that a number of those present, at his request, gave him money to be turned over to the company.

Under count XIII it was proved that on December 16, 1950, the witness Griffin in his own office met Kiers at Bellflower. He presented some geodetical survey maps of oil-bearing lands near Worland, Wyoming. On invitation, Kiers returned several times and requested Griffin to accompany him on a visit to Sears' home. They made the visit and there met Sears who showed more maps and said the well was about to be brought in; that they had a Nevada corporation and had permission to operate in California. In a week Griffin drew a check for $2,500 payable to the Sierra Nevada Oil Company. He took the H-form for requesting shares in the company, filled it in, and sent it and his check to the company at Las Vegas and received a certificate for 2,500 shares at his home in Los Angeles County.

## Law Applied

■ Under the Corporate Securities Act there is little room for doubting the existence of reasonable grounds for believing respondents should be tried for the crimes charged. They attempted to sell and sold securities (Corp. Code, § 25000); they sold the notes of Sears (*ibid*). They had no permit as the law required. (Corp. Code, §§ 25500 and 25507.) They conspired to violate the Corporate Securities Law. All the acts of both respondents recited above show that their minds were working in unison in an attempt to gather in from the general public all available money by the sale and issuance of corporate shares or by accepting loans from persons zealous to make profitable investments. While so conspiring to sell, and while selling the stock of their corporation, they were con-

tinuously conscious that they had not first gained the consent of the Division of Corporations, a written permit, to make such sales. They often reminded their investors they had none. No proof had been made to the commissioner that the lands in Cajon Canyon or in Wyoming were in actual or potential "proven territory" or that the officers of the oil company were worthy of trust or knew anything of the art and industry of recovering petroleum products from the earth. Thus, a conspiracy was established. (Corp. Code, § 26104; *People* v. *Weitz,* 42 Cal.2d 338, 343 [267 P.2d 295]; *People* v. *Frankfort,* 114 Cal.App.2d 680, 688 [251 P.2d 401]; *People* v. *Gordon,* 71 Cal.App.2d 606, 626 [163 P.2d 110]; *People* v. *Chait,* 69 Cal.App.2d 503, 512 [159 P.2d 445]; *People* v. *Griffin,* 98 Cal.App.2d 1, 42 [219 P.2d 519].) They had attempted to exploit a former corporation, Western Research Laboratories. At that time they were reassured that unrestricted permits are not issued to "wild cat" corporations or to those exploring in "wild cat" territory.

The oil company had its domicile in Nevada. Sears and his wife were the controlling directors. Their home was in Los Angeles County. It was there that Sears told the witness Bremner that he had invested $50,000 of his own money in the oil venture. He met a number of his investors in Cajon Canyon, told them production was expected, to send their money to the Las Vegas office for stock. While in most instances he required the money to be sent to Nevada or Wyoming for the purchase of stock or for loans to himself, at times shown in the statement of evidence, he accepted checks in Los Angeles County. Kiers took $500 from Christo, $500 from Bensema. At every meeting at Sears' home, Kiers was present. Sears always presided at stockholders' meetings but Kiers was close by. Kiers told Bremner that Sears had agreed to pay him 10 per cent commission on sales of stock and $50 as a weekly salary, but told Bensema he was getting neither salary nor commission. At the meetings in his home, Sears exhibited maps and explained about the company's lands in Wyoming and encouraged all stockholders to solicit people to buy stock.

It is a reasonable inference that when Sears told them he "was tied up" and needed money to bring in a well in Wyoming it was for the purpose of inducing his hearers to make him loans. Proof of his purpose was complete when he accepted the money of his lenders. He always held out the promise that they could get stock when he obtained a

permit. When the meeting was held at Vogel's home, Sears over the telephone and Kiers by direct contact told the stockholders money was needed to complete the well at Worland and requested loans with the promise that if Sears could get stock, the lenders would be entitled to the stock if they wished it. Sears told Jacobs the same and that there was no stock available. But Jacobs sent his money through the mail to the Las Vegas office and received shares or a Sears' note, for a total outlay of $10,800 in the Sierra Nevada Oil Company.

"VIOLATIONS OF THE ACT"

Evidence as to counts II to XIII (except XII) charging "violations of the Act" (Corp. Code, §§ 25009 and 26104) is sufficient to warrant the commitment of respondents for those crimes. Not only does the statement of the proof, above recited, give rise to a grave suspicion of the guilt of respondents for all the violations alleged in 11 counts following the charge of conspiracy, but the testimony introduced (on count II) shows that Kiers invited Cornie Bouma to accompany him on a visit to the well in Cajon Canyon and there introduced him to Sears; requested Bouma to invest $1,000 and after the latter's refusal, offered him stock at two for one. He took $250 from Bouma "to finish drilling the well at Cajon Pass," and sent it to Nevada. For such sum Bouma at Norwalk, California, received 500 shares of the oil company by mail. Neither $250 nor any portion thereof was returned to Bouma. Such sale, without first having received a permit to sell the company's stock, was a violation of section 26104 of the Corporations Code which forbids any officer, agent or employee of a company to direct, or aid in, the sale of its securities, or in any respect, wilfully fail to comply with any provision of division 1 of title 4 of such code (§§ 25000 to 26104). Not only does that division require every corporation to obtain a permit to sell its securities, but it provides that every sale in violation of the statute is void (§ 26100) and is a fraud on the vendee. (*McFaul* v. *Deck,* 30 Cal.App.2d 424, 427 [86 P.2d 890]; *Auslen* v. *Thompson,* 38 Cal.App.2d 204, 210 [101 P.2d 136]; *Pickford (Mary) Co.* v. *Bayly Bros., Inc.,* 12 Cal.2d 501, 525 [86 P.2d 102].)

By similar process, respondents sold shares of the company to the witness Sidney Van Laar (count III) for $400.

By virtue of the sales made by respondents to witnesses Bouma, Van Laar, Vogel (count IV), Jacobs (count V), Ben-

sema (count VI), Dr. Kaylor (counts VII, VIII and IX), Rex Kaylor (count X), Bensema (count XI), Griffin (count XIII) there was good reason for prosecuting respondents for violating the Corporate Securities Law. In each instance the sale was made in California, the money and application were forwarded to Nevada and the certificates were returned by mail to the vendees at their California homes. The shares issued were all signed by Sears as president. His conversations with investors preceded the issuance of the shares in practically every instance. But if not, Kiers, the undisputed agent of Sears, induced the investment. Every certificate referred to in the proof was issued after Kiers had "sold" the venture to his victim. Therefore, Sears and Kiers were guilty as principals. (*People* v. *Rubens,* 11 Cal.App.2d 576, 584 [54 P.2d 98, 1107]; Corp. Code, § 26104.)

While counts XII and XIV to XIX declare thefts, it is clear that they are also irregularities of the nature forbidden by the statute. The conduct of Sears in soliciting loans to be turned over to the oil company to be used in drilling and for which he would and did give his note, constituted a series of sales and violations of the statute. (*People* v. *Whelpton,* 99 Cal.App.2d 828, 831 [222 P.2d 935]; *People* v. *Sidwell,* 27 Cal.2d 121, 128 [162 P.2d 913]; *Rhode* v. *Bartholomew,* 94 Cal.App.2d 272, 279 [210 P.2d 768].)

In every case of the issue of shares, it was in violation of the act. Every corporate officer who with one or more persons solicits another to buy the shares or securities of the corporation without a permit to do so, conspires to violate the statute. (Corp. Code, § 26104, subd. g.) Because the shares were issued by a Nevada corporation, they were "securities of its own issue." Kiers is not to be exempted from prosecution because he was not an officer. He was in the vanguard of the forces campaigning for the sale of the stock. He conveyed prospects to the canyon to see the operations; told the needs of the company; often accompanied the people to Sears' home to attend meetings for the discussion of the stock; actually made sales and received the funds in payment therefor, knowing that no permit had been issued. In the case of every sale, it was made in Los Angeles County. The checks sent in payment were mailed there; the orders for the stock accompanied the checks payable to the oil company, and every certificate ordered was returned to that county. ▪ But in making proof before an examining court of the facts of a violation of the Corporate Securities Act, it is not required

that venue be established beyond a reasonable doubt. ■ Guilt is not the issue before the committing magistrate. ■ Reasonable doubt is a doctrine for the guidance of the trier of fact. (*People* v. *Bargala*, 81 Cal.App. 381, 386 [253 P. 938] ; *People* v. *McGill*, 10 Cal.App.2d 155, 159 [51 P.2d 433].) To hold respondents, sufficient proof was received showing that they made sales in California of the stock of a Nevada corporation, and got the money from the investors. who were present in this state. (*People* v. *West*, 34 Cal.App.2d 55, 59 [93 P.2d 153].) In view of the evidence admitted before the magistrate, no court could be justified in declining to commit a defendant.

### THE THEFT CHARGES

Accusing Sears of theft in taking the money of the witnesses Bensema, the Kaylors, Van Laar, and Jacobs is readily understood in the light of section 484 of the Penal Code. ■ That statute makes one family of larceny, embezzlement, fraudulent appropriation, false pretenses under one generic name of *theft*. (*People* v. *Hiden*, 102 Cal.App.2d 655, 659 [228 P.2d 95].) ■ Sears took the moneys of the several victims under circumstances that spelled fraud. Every transaction was a fraud. He gave the lenders no title to the promissory notes in which they were named payees. He got their money by a false pretense, a trick or an artifice or by appropriating it after it was intrusted to him. Getting it by any of these methods is theft. They had no consideration for their money. What they delivered to him as loans was to be used for drilling by the corporation. That promise created a question that might give rise to contradictory inferences, one of which was that Sears had no intention of returning it. If it should be so found, his conviction for theft would follow. So far, no part of such funds has been repaid.

Why should not Sears be tried for his taking $3,000 from Jacobs on April 7, 1951? Sears had received the "desist and refrain order" by March 26. April 1 he complained that the "corporate funds were tied up." He promised that he and Mrs. Sears would both sign his personal note to Jacobs; to repay with stock or return the money. The lady never signed the note, and the money was never repaid and no stock was ever issued for it. Not only that, but on April 16, 1951, Jacobs gave Sears $1,000 as a loan on the latter's promise that his note for that sum signed by himself and wife would be delivered to Jacobs. The victim mailed the check to Worland,

but it was deposited April 23 in Altadena, the note not received until September 6 and signed only by Sears. He had promised to use the money to continue drilling operations in *Wyoming*.

Sears made a similar deal with Bensema April 5, 1951, for $1,000. (Count XVIII.) The same promises were made and not fulfilled and no part of the money was ever repaid. He sent the check to Worland, it was deposited in Altadena. April 19 he sent $1,000 to Worland. From such facts, inferences that Sears never intended to pay the notes might be justifiably drawn. (See *People* v. *Staver,* 115 Cal.App.2d 711, 718 [252 P.2d 700] ; *People* v. *Wisecarver,* 67 Cal.App.2d 203, 209 [153 P.2d 778].) Also, a jury might infer that Sears' promises to have his wife sign the notes to Jacobs and Bensema were made without any present intention of performing them, a case of false pretense—theft. (*People* v. *Staver, supra; People* v. *Jones,* 36 Cal.2d 373, 377 [224 P.2d 353].) The inferences thus deducible are strengthened by the facts in evidence that Sears and his wife had a "Knoll Grove Estates" account with their local bank; that they there deposited $1,000 May 2, 1951, from bank No. 90-1410, (same number as Bensema's Bellflower bank). On May 18, 1951, $1,062.16 was deposited in this account. The ledger sheet shows transactions from February 5, 1951, to August 13, 1951.

The commercial checking account of L. A. or Gladys K. Sears in Altadena shows three deposit slips. The first was on April 13, 1951, covering seven items for a total of $12,200; the second on April 23, 1951, with five deposits totaling $15,700; the third on June 23, 1951, showing items, to wit, $200, $2,250, and $2,000. Pray, where was all this money from: deposited in the very period when Sears and Kiers were collecting money from their victims to drill for oil in Wyoming, and Sears was telling them his money was all gone and was asking the people to loan more money to the company?

But the story is not complete. Sears and his wife as president and secretary of Knoll Groves Estates made a deed August 23, 1951, conveying to Gladys Sears Lot 71, Tract 2123, Los Angeles County. Inasmuch as Gladys did not sign the notes to Jacobs and Bensema prior to such transfer, and since Jacobs and Bensema had given their checks to Sears on his promise that Gladys would sign the notes for their money loaned to Sears, it would cause no court or jury anguish

of soul to infer that Sears committed a false pretense in persuading those men to advance their moneys to him to be used by the company.

But the story of Knoll Grove Estates is not finished. By count XII Sears is accused of having taken $1,000 from Bensema on April 19, 1951. At the meeting at Vogel's home on April 15, Sears told Bensema that such moneys as might be loaned to him would be used by the company for drilling. When he received Bensema's check, he endorsed it "for deposit only to the acct. of Knoll Grove Estates—by L. A. Sears" and deposited it to the account of the Knoll Grove Estates of which Sears was president. From the facts of such endorsement, the deposit slip and the ledger sheet showing the Knoll Grove Estates got Bensema's $1,000, the inference might reasonably be warranted that after he took Bensema's money, Sears appropriated it to his own use by putting it into the bank account of another venture of his own of which Bensema had never heard. At any rate, Bensema never received a note signed by Mrs. Sears; his money was presumptively never used by the oil company, but by Sears' real estate venture (*People* v. *Weibert,* 18 Cal.App.2d 457, 462 [64 P.2d 169]) and Bensema never received stock for his second $1,000 and was never repaid any portion thereof. Whether Sears embezzled the money after holding it for awhile or converted it to his own use promptly, from the facts proved, it could be inferred that he committed grand theft. If the trier of fact should draw hostile inferences, he could be convicted of theft by trick and device. (*People* v. *Waxman,* 114 Cal.App.2d 399, 410 [250 P.2d 339]; *People* v. *Mason,* 86 Cal.App.2d 445, 452 [195 P.2d 60].)

Under count XVI facts were placed in evidence from which the ultimate fact alleged might be properly found, to wit, that Sears feloniously took $5,000 from Dr. Kaylor about April 3, 1951. The evidence was that Sears told the doctor at the meeting of April 1 that he would get stock for the $5,000 if it could be issued, or the money at the end of a year at 6 per cent interest on the loan and the note would be signed by Mrs. Sears. The note received was not signed by Gladys. Whether Sears' intent at the time of taking the $5,000 from Dr. Kaylor was felonious is a fact to be determined by the jury when the question submitted is as to the guilt of the accused. (*People* v. *Brown,* 52 Cal.App.2d 428, 431 [126 P.2d 406].)

By reason of the identity of Sears' representations and

promises to Kaylor, Bensema, Jacobs and others with those made to Van Laar (count XVII), and by reason of the latter's loss of the moneys advanced to Sears and their not having been used by the company for drilling, a finding of his guilt might be warranted.

When the trial court is confronted with a motion to dismiss an action as in this proceeding (Pen. Code, § 995), a granting of the motion to quash an information is not justified merely because the guilt of the defendant was not demonstrated to the examining court. The granting of such a motion is not necessary merely because a trial might be long and expensive. A trial is not inadequate because it is long and tedious. (*Bennett* v. *Superior Court*, 218 Cal. 153, 156 [21 P.2d 946].) The trial of serious charges alleged to have violated the peace and dignity of the state is the route constitutionally designed, unless the proof submitted is destitute of inculpatory facts. Such is not the case here. Respondents are shown to have taken thousands of dollars from good citizens of this state ostensibly for stock in a questionable enterprise which had no permit to sell or issue its securities. Their motives for their deeds should be ascertained by a jury of their peers. The purpose of the state in inquiring into intent of respondents is to protect the public and it is entitled to present its cause, to the end that justice may be done. (*People* v. *Wisecarver*, 67 Cal. App.2d 203, 209 [153 P.2d 778].)

Subsequent to the order granting a rehearing, respondents filed their answer to the petition for rehearing. Attached to it is an "order on trustee's petition to compromise and settle the stockholders' proof of interest claims of Lawrence L. Kaylor, Elaine S. Kaylor, Rex Kaylor, Albert Kiers, Victor C. Rose, Anna M. Rose, Louis A. Sears, Gladys K. Sears, and money claims of Louis A. Sears." Such order was made by the United States District Court for the District of Nevada on February 3, 1953. The answer of respondents to the petition for rehearing moves that said order be filed herein, and that it be considered along with the record before the examining magistrate as additional proof of respondents' innocence. Such a request is justified by no known authority.

The motion is denied.

Judgment is reversed with instructions to deny the motion under section 995 of the Penal Code.

Fox, J., concurred.

McCOMB, J.—I dissent for the reason expressed in the former opinion of this court filed March 12, 1954, which read:

From an order granting defendants' motion to set aside an information charging (1) both defendants with violating the Corporate Securities Act, and (2) defendant Sears in seven counts with grand theft, the People appeal.

Viewing the evidence as we must in the light most favorable to supporting the action of the trier of fact, the rule being established that unless an appellate court "is able to say that a clear abuse of discretion is made to appear, it will not divest the trial court of the discretionary power reposed in it. It will rather be presumed in favor of the action of the court that its discretion was properly exercised, and the burden rests on the appellant to show an abuse." (4 Cal.Jur.2d (1952), Appeal and Error, § 592, p. 469.)

The record discloses that on November 25, 1949, defendant Sears made an application to the Corporation Commissioner of the State of California to sell stock in Western Research Laboratories, Inc., of which said defendant was a director and chairman of the board. An amended application was also filed on December 13, 1949, with the California Corporation Commissioner. The commissioner proposed to issue what was known as a "closed permit," meaning that stock could not be sold to the general public but only to certain persons named in the permit, and on the conditions therein set forth. Before any permit was issued, however, the applicant requested that the application be withdrawn and an abandonment order was issued on April 26, 1950. On February 15, 1950, articles of incorporation of the Sierra Nevada Oil Company were filed in Nevada, defendants being the organizers thereof.

Thereafter the complaining witness and a representative of other persons living in and near Artesia contacted defendants, stating they desired to purchase stock in the Sierra Nevada Oil Company. They were each informed that defendants had no authority to sell such stock but that on the contrary, it would be necessary for anyone desiring to invest money in the company to write directly to Nevada in order to obtain such certificates of stock.

As an example, Mr. Harm Bensema, the manager of the United Dairymen's Association, located in Artesia, California, stated that the fact oil was being drilled for was "common

talk'' in the community, and he approached defendant Kiers because he had heard so much about the drilling and wanted to tell Mr. Kiers he was willing to take some of the stock even though he knew Mr. Kiers could not sell it; that he went to the well site and at that time met defendant Sears, but to the best of his recollection did not speak to Mr. Sears about stock, but immediately upon returning home from the well site he purchased stock in the Nevada corporation; that he was too busy to write a personal letter, but asked defendant Kiers to ''do the errand'' for him.

There is no evidence that any representations were made to Mr. Bensema relative to the stock and so far as the record indicates he purchased the same under his own volition without discussing the matter with anyone, sending his check and order to Nevada.

After a period this same general situation obtained as to the other stockholders in the corporation.

Thereafter the various stockholders in California met on several occasions at the home of Mr. Vogel, one of the investors. These individuals had a long distance telephone conversation with defendant Sears at one of these meetings. Subsequently Mr. Vogel, Mr. Bensema and the other stockholders loaned sums of money to defendant Sears, receiving the latter's personal notes therefor, and with the knowledge that defendant Sears was to lend the money to the Sierra Nevada Oil Company and that no stock could be issued therefor, but that possibly in the future they might be able legally to obtain shares of stock in payment of the money they had advanced if they so desired. If at such time they did not want the stock, the money would be repaid. The money was loaned by defendant Sears to the Sierra Nevada Oil Company and used in the course of its business.

In June of 1951 the affairs of the company were brought under the jurisdiction of the United States District Court of Nevada, pursuant to Chapter X of the Bankruptcy Act, and all rights, claims and disputes were amicably adjusted by all the parties concerned with the help of the court and the representatives of the Securities and Exchange Commission. Since then the affairs of the Sierra Nevada Oil Company have been supervised by the Reorganization Court in Nevada, and everyone interested has been represented before that court. Proceedings were long and complicated and a plan of reorganization has been approved and confirmed.

During this extended period all contentions were aired in open court before representatives of the various interests involved. The Security and Exchange Commission was at all times aware of and participated in the proceedings in Nevada and knew of the California Corporations Commissioner's activities. The complaining witnesses in the present case were represented, among others, before the United States District Court and participated in the proceedings. All of the loans involved in the present case were disposed of as direct obligations of the corporation debtor with the consent of everyone concerned.

Since from the foregoing evidence it is clear that all the investors knew that the Sierra Nevada Company could not sell stock in California and were so advised by defendants, the evidence sustains the finding that neither defendant solicited the sale of the stock of the Sierra Nevada Company in California. The trial court's finding that each defendant had been indicted without reasonable or probable cause to show a violation of the Corporation Securities Act is sustained by the evidence.

Turning to the counts charging defendant Sears with grand theft, the record discloses that defendant Sears informed the borrowers he could not sell stock in the Sierra Nevada Oil Company; that the money which they advanced to him was a personal loan and his wife would sign the notes. The record also discloses that Mrs. Sears did not sign the notes. So far as appears from the record this was a mere inadvertence and no witness at the preliminary examination seemed to attach any importance to her failure to do so. The reason is apparent. In the present case the notes, which would form the basis of the grand theft count as stated above, were recognized in the bankruptcy proceedings as obligations of the corporation because Mr. Sears had advanced the money to the corporation and each lender was found to be an unsecured creditor of the oil company.

A certified copy of the order of the United States District Court, acting as a reorganization court, that all of the lenders, including the complaining witnesses herein, would look to the debtor corporation, Sierra Nevada Oil Company, for payment of the loans, was before the trial court on the motion from which an appeal has been taken. Clearly the trial court in the instant case was justified in holding that the evidence did not support a finding that there was reasonable or prob-

858

able cause to believe that defendant Sears had committed grand theft.

*B. C. Turf & Country Club, Ltd.* v. *Daugherty,* 94 Cal. App.2d 320, 329 et seq. [210 P.2d 760], is in accord with the views expressed herein.

Respondents' petition for a hearing by the Supreme Court was denied May 27, 1954.