[Crim. No. 1166.    Fourth Dist.    Mar. 26, 1958.]

THE PEOPLE, Appellant, v. E. J. CORNETTE et al., Respondents.

Edmund G. Brown, Attorney General, William E. James, Deputy Attorney General, Lowell E. Lathrop, District Attorney (San Bernardino), and Edward P. Foley, Deputy District Attorney, for Appellant.

Harold M. Fagin, under appointment by the District Court of Appeal, and Hennigan, Ryneal & Nixen for Respondents.

GRIFFIN, J.—Defendants E. J. Cornette, Dwight Ewing and Kenneth Koorndyk were held to answer and were subsequently charged jointly in an information in count one with conspiracy to obtain money or property under false pretenses (Pen. Code, § 182). Five claimed overt acts are set forth, alleging generally the surrounding facts pertaining to five separate specified charges of grand theft contained in five separate counts involving the purported sale and installation by defendants of gas furnaces upon written contract for the parties named. On a motion to dismiss and set aside the information and action, made under the provisions of section 995 of the Penal Code, the court granted it on the ground

the record showed no reasonable or probable cause for the commitment. The People appealed.

Defendant Koorndyk was branch manager of Holland Furnace Company in Riverside. Cornette was a salesman. Ewing was an installer of new furnaces and a repairman. The *modus operandi* of the conspiracy charged was that Cornette would go to the home of a prospective customer dressed in a semi-uniform with a badge of some sort displayed on the shirt. After knocking at the door he informed the housewife or occupant that he was inspecting floor furnaces in houses in that area to see if they were functioning properly or needed cleaning. On some occasions, believing he was a city inspector or gas inspector, he was permitted to enter and make the examination. Thereafter, the occupant of the house was told that the furnace needed cleaning, and that this operation would cost about $17.50. Very few of them had that amount of cash available. The agent would then agree to do the work at $5.00 down and the balance in installments. The following day Ewing or some workman would perform the cleaning job. Cornette would return to the home that night and after the cleaning job was partially rendered he would take his flashlight and point to parts of the furnace and tell the occupants: "Do you know the condition of your furnace is a fire hazard?" or "The flues are badly burned and deteriorated" or "The thermostat is out of order and your family could die of asphyxiation," or that it was a waste of money repairing the furnace when it might blow up any time. Being laymen the occupants could not determine the truth of his representations although some of them said they had never noticed the odor of gas or known that anything was wrong with the furnace. They were told that escaping gas had no odor. The evidence produced by the People was to the contrary. Generally thereafter, the floor furnace was removed by Koorndyk or the agent, taken into the yard, water poured into it and the occupants were shown water leaking from it and were told this test indicated a leak through which gas could escape and cause an explosion in the house and kill all the family and children through asphyxiation. Through this fright the alleged victims would become interested in the purchase of a new furnace. Defendant Koorndyk generally appeared soon thereafter with pictures and a description of new heaters and said he had heard their furnace was in bad shape. He was generally successful in signing up the victim to a contract of purchase and to install a new furnace at a cost ranging from

$300 to $1,100. Loan notes on a time-payment plan were generally secured and assigned to the bank by defendants' company. Thereafter payments were to be made to it. Ewing generally did the installation work, but agreed with Koorndyk on occasions that the furnaces were corroded or "burned out" and that a new installation was necessary. The method of approach varied somewhat in each instance but the representations as to the condition of the furnaces and the likelihood of the inhabitants and the children becoming asphyxiated were about the same. In one instance one victim said they signed her up for a new furnace at $300, but when she got the bill it was $432. After the installation of a new furnace, another victim took her old furnace to a sheet-metal shop, and after investigation she was told there was nothing wrong with it. She called Koorndyk and told him about it and he refused to let her rescind the contract but allowed her to sign a new one giving her credit for $60 for her old unit. Another party claimed Koorndyk agreed to put in a Holland furnace but when an inspector and an expert furnace man came out to look at the old furnace they found the new one installed was not a Holland Furnace but another make unknown to them, to wit, Frazer-Johnson. Another party claimed that it was represented that the new furnace installed had a capacity of 70,000 BTU's, but she later learned it was only 65,000 BTU's, and that the new one installed was insufficient to do the work represented.

A city building inspector testified that he sent a letter directed to Koorndyk and asked him to come to his office in regard to installing furnaces in the city of San Bernardino without a permit. He informed Koorndyk that he had found installations which had not been inspected by his department and that he was subject to a penalty for so doing. He testified Koorndyk agreed to pay the penalty and to furnish a list of other furnaces installed which were not then known to the inspector, and that he returned with a partial list. He further testified he had no conversation with Koorndyk about his method of selling furnaces, and that the subject did not come up.

Two qualified experts testified that they went to the homes of several of these claimed victims, examined the furnaces that were removed and found nothing wrong with them and no defects; that the furnaces were not burned or rusted out; and that they did not give them the so-called "water test" because that would not necessarily reflect the condition of a

furnace. Parts of other furnaces dismantled by defendants were introduced in evidence. The testimony of the experts showed, in respect to them, that it would be difficult to determine whether a furnace leaked gases by examining those parts but in their opinion the parts examined by them did not indicate they were either "corroded" or "burned out."

A representative of a sheet metal concern, dealing in furnaces and their installation and repair, to whom the heating element of one of the furnaces was taken for examination, testified that he found nothing wrong with the heating element; that it was in good shape; and no defects were noticeable.

Koorndyk testified he did not believe Ewing cleaned any of the furnaces indicated but confined his labor, under his direction, to installation of new ones; that he was paid $90 a week for his services, did not receive commissions on any of these deals, and had no knowledge as to what representations were made by other men, but he could not "be 100 per cent accurate" on some of these things.

Defendants, in justifying the ruling of the court, contend that in establishing grand theft by obtaining money by false pretenses, it must first be shown: (1) That certain representations were made; (2) That they were false; (3) That they were known to be false by the persons making them; (4) That they were relied upon by the victim; and (5) That money or property was obtained as a result. (*People* v. *Frankfort*, 114 Cal.App.2d 680 [251 P.2d 401]; *People* v. *Myers*, 206 Cal. 480, 483 [275 P. 219].)

We have not set forth all of the testimony respecting each count of the information but have stated a general résumé of it which tends to support the charges. There are some conflicts and discrepancies in the evidence which might have some weight in the ultimate trial of the action. ■ On a motion to dismiss under this section neither the trial court nor this court is authorized to weigh the evidence and determine the conflicts. The sole duty is to determine whether there was sufficient evidence presented to the committing magistrate, conflicting or otherwise, which would establish a reasonable probability of defendants' guilt. (*Davis* v. *Superior Court*, 78 Cal.App.2d 25, 27 [177 P.2d 314]; *People* v. *Platt*, 124 Cal.App.2d 123, 130 [268 P.2d 529]; *People* v. *Sears*, 124 Cal.App.2d 839 [269 P.2d 683]; *Bompensiero* v. *Superior Court*, 44 Cal.2d 178, 183 [281 P.2d 250]; *People* v. *Jackson*, 146 Cal.App.2d 553 [303 P.2d 767]; *People* v. *Misner*, 134

Cal.App.2d 377 [285 P.2d 938]; *People* v. *Nathanson,* 134 Cal.App.2d 43 [284 P.2d 975].) Proof of guilt of the defendants need not be demonstrated. (*People* v. *Sears, supra.*)

The evidence, examined in the light indicated, shows a compliance with the first four prerequisites above mentioned by defendants. As to the fifth, it may be questioned whether money or property was obtained in the amounts alleged. It does appear by these claimed false representations the so-called victims did have their furnaces removed when in fact, had they known their true condition, they would not have incurred the additional obligations. They were falsely induced thereby to sign contracts to purchase new ones and to have them installed for prices ranging from $300 to $1,100. Negotiable promissory notes were given as evidence of payment. Although few payments had been made on them at the time of the discovery of the alleged fraud, it does appear that the respective parties are still being held liable for payment of the full amounts indicated. Some of the parties were questioned as to whether they contemplated having said notes set aside for fraud in a subsequent legal action. There was no affirmative answer, and so far as the record indicates they are still liable on them.

In *People* v. *Frankfort,* 114 Cal.App.2d 680 [251 P.2d 401], it was said that a promissory note itself is property within the meaning of section 484 of the Penal Code and that if the thing stolen consists of any evidence of debt or other written instrument the amount of money due thereupon or which in any contingency might be collected thereon, is the value of the thing stolen. It then held that when it is shown that the victims signed promissory notes and contracts obligating themselves to pay sums in excess of $200 they parted with property justifying a conviction for grand theft. Whether the so-called victims in this case were defrauded of property or money exceeding $200 in value was a factual question for the trier of fact.

■ The gist of a criminal conspiracy, as charged in count one, is a corrupt agreement of two or more persons to commit an offense prohibited by statute, accompanied by some overt act in furtherance of the objects of the agreement. (Pen. Code, §§ 182 and 184.) ■ It may be established by circumstantial evidence and may be inferred from the acts and conduct of defendants in mutually carrying out a common purpose in violation of a statute. ■ Since members of a conspiracy are bound by all acts of all members, an overt

act by one member is sufficient. (*People* v. *Frankfort, supra.*) There is evidence in this case indicating that Ewing was present and joined in some of the representations made and assisted in removing the furnaces which he might well have known were not defective. Whether he is an innocent victim of the alleged conspiracy is a question for the determination of the trier of fact. (*People* v. *Steccone,* 36 Cal.2d 234, 237 [223 P.2d 17].) It is not necessary to show that each party personally benefited from the product of the crime. (*People* v. *Rabe,* 202 Cal. 409, 423 [261 P. 303] ; *People* v. *Platt,* 124 Cal.App.2d 123, 131 [268 P.2d 529].) There was sufficient evidence to show a reasonable probability that the offenses alleged were committed by the defendants charged.

Order setting aside information reversed.

Barnard, P. J., and Mussell, J., concurred.